UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LAKE STATE RAILWAY COMPANY,

        Plaintiff,                           Case No. 17-cv-12449

v.                                          Honorable Thomas L. Ludington

FREELAND TILE DRAIN DRAINAGE DISTRICT,
OSTRANDER DRAIN DRAINAGE DISTRICT, and
BRIAN WENDLING, Saginaw County Public
Works Commissioner,

        Defendants.

_____/

**ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER,
DIRECTING SERVICE, SCHEDULING HEARING ON MOTION FOR PRELIMINARY
INJUNCTION, DIRECTING APPEARANCE, AND PERMITTING RESPONSE**

On July 28, 2017, Plaintiff Lake State Railway Company filed a complaint naming Freeland Tile Drain Drainage District, Ostrander Drain Drainage District, and Brian Wendling, the Saginaw County Public Works Commissioner, as Defendants. Compl., ECF No. 1. In the complaint, the Railway seeks injunctive relief from the imposition of a special tax assessment meant to allocate the cost of drainage improvements in the district by calculating the "stormwater runoff-generating characteristics" of private property. Compl. at 3. In November 2015, the Railway was assessed $71,811.00 for the Freeland Tile Drain Drainage District and $8,646.40 for the Ostrander Drain Drainage District. Compl. at 3, 6. According to the Railway, those assessments became due and payable on July 31, 2017. Mot. Temp. Res. At 2, ECF No. 4. On July 31, 2017, the Railway filed a motion for a temporary restraining order and preliminary injunction seeking an order "enjoining the Commissioner from taking any further action to assess, collect, or levy the Drain Code assessments as currently calculated." *Id.* at 25. For the

reasons stated below, that order will be granted and a preliminary injunction hearing will be scheduled.

**I.**

At this stage, the well-pleaded factual allegations in the Railway's complaint will be assumed to be true. Plaintiff Lake State Railway Company (the "Railway") is a Michigan corporation operating out of Saginaw, Michigan. Compl. at 1. Defendants Freeland Tile Drain Drainage District ("Freeland District") and Ostrander Drain Drainage District ("Ostrander District") are both located in Saginaw County. Compl. at 2. Defendant Brian Wendling (the "Commissioner") is the Public Works Commissioner for Saginaw County. *Id.* As Commissioner, he is responsible "for apportioning the cost of a drain project among municipalities and/or land owners or land users within the drainage district." *Id.*

**A.**

In November 2015, the Railway was "apportioned 9.09% of the total $790,000.00 project involving improvements within the Freeland Drain [District] for a total assessment of $71,811.00." *Id.* at 3. To arrive at that apportionment, the Commissioner utilized a "formula commonly known as a 14a calculation." *Id.* The calculation can be summarized as follows:

> [The 14a calculation] derives from a process used by drainage districts to determine the stormwater runoff-generating characteristics of the various components public roadway rights-of-way. [sic] For example, paved surfaces, grassy medians, gravel shoulder and like roadway components are each accorded a different "runoff coefficient" that reflects that use's relative contribution to stormwater runoff. Higher runoff coefficients correspond to land uses involving a higher amount of impermeable surface that tend to generate greater stormwater runoff that drainage districts are typically entrusted to mitigate.

*Id.*

The Railway is a private land user and its property is thus distinguishable from a highway right-of-way, but, to determine liability for the Freeland Drain project, the Commissioner

nevertheless "chose to apply to 14a runoff coefficients to [the Railway]s] property, employing makeshift proxies under a menu of highway land uses." *Id.* The Railway alleges that multiple aspects of the assessment overstated the Railway's actual contribution to stormwater runoff within the Districts. First, the Railway alleges that the Commissioner credited the Railway with more acreage than it owns. *Id.* at 4. The Commissioner concluded that the Railway had 1.67 acres of gravel and 2.5 acres of grassland. *Id.* Under state highway rules, gravel roads have a stormwater runoff coefficient of 0.70, while grassy areas have a coefficient of 0.20. The Commissioner applied those coefficients to the Railway's acreage, arriving at "an average runoff coefficient of 0.4 for [the Railway's] right-of-way." *Id.* The Railway contends that this average coefficient "overstates [the Railway's] contribution to stormwater runoff within the districts and thus subjects [the Railway] to a much higher assessment than that of other commercial and industrial land uses." *Id.* In support of that assertion, the Railway explains that the Commissioner "presumed an average runoff coefficient of 0.2" for "all other private land uses in the district." *Id.*

According to the Railway, "[t]he assessments to [the Railway], the County, Titabawassee Township and the State of Michigan covered 71.34% of the project costs. The remaining land in the district, approximately 84 acres, was assigned a pro rata share of the project at 28.660%, with not one of the other properties' apportionment exceeding 1% of the project cost." *Id.* at 4–5. The Railway was assessed tax liability at approximately $17,221 per acre. *Id.* at 5. Other private land owners with allegedly comparable land uses were assessed significantly less liability. For example, the Freeland Bean and Grain operation, which encompasses 2.93 acres, was assessed $5,989.05, or approximately $2,044 per acre. *Id.* at 6. The Meyers Oil Company, Inc., owns 8.77 acres and was assessed $1,335.71, or approximately $152 per acre. *Id.* The Great Lakes AG

Investments, LLC, owns 4.95 acres and was assessed $3,783.96, which comes to approximately $764.44 per acre. *Id.* Thus, the Railway's liability per acre is several multiples higher than the liability assessed for allegedly comparable private land users in the Freeland District.

The Commissioner used the same 14a calculation when apportioning tax liability for the Ostrander District. In the Ostrander District, the Railway was assessed $8,646.40 for 4.24 acres, which comes to approximately $2,039 per acre. *Id.* at 7. Like in the Freeland District, allegedly comparable land owners were assessed far less tax liability:

> Great Lakes AG was assessed a total of $487.17 for its 4.95 acres of land in the district – a $98.41 per acre assessment. Kinaia, the owner of a strip mall with substantial building coverage and parking lots (and therefore likely to contribute to stormwater runoff at per acre rates well exceeding that of railroad right-of-way), was assessed $397.46 for its 3.165 acres – a rate of only $125.56 per acre. In general, the per-acre assessments for the remaining property owners within the special assessment district generally ranged from $100 to $500 per acre.

*Id.*

**B.**

The Railway alleges that it first learned of the tax assessments in November 2015, when it received an invoice for the taxes. Mot. Temp. Res. at 4. Although state law provides a mechanism for reviewing and challenging stormwater runoff assessments, the Railway never received notice of the assessment and thus missed the ten day deadline to challenge it. *Id.* On February 8, 2017, the Railway brought suit in Saginaw County Circuit Court challenging the validity of the assessment. Compl. at 9. Defendants in the state action (the same named in the current action) "argued for dismissal due to [the Railway's] failure to adhere to the Drain Code's ten (10) day appeal rules, and under the doctrine of laches." Mot. Temp. Res. at 5. On April 24, 2017, the Saginaw Cournt granted the motion to dismiss the case on those procedural grounds. *Id.* The order of dismissal was entered on June 19, 2017. *Id.* The Railway sought reconsideration

of the dismissal, which was denied on July 10, 2017. *Id.* That order denying reconsideration became final on July 31, 2017. *Id.* To this Court's knowledge, no appeal has been filed.

**C.**

Based on the foregoing factual allegations, the Railway contends that it has been "singled out." *Id.* at 8. It contends that there is no principled rationale for the significant disparity "between the per-acre tax assessed to the railroad and the corresponding per-acre tax assessed to all other industrial and commercial land uses." *Id.* Accordingly, "[t]he disparity in the tax rates is so grossly arbitrary and disproportionate as to demonstrate on its face railroad discrimination." *Id.* at 9. The Railway thus alleges that 49 U.S.C. § 11501(b) has been violated.

**II.**

**A.**

Federal Rule of Civil Procedure 65 provides that a "court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney" if two requirements are satisfied: (1) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition"; and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

Four factors govern whether the Court will issue a temporary restraining order (the same four factors governing whether to issue a preliminary injunction): (1) whether the plaintiff has demonstrated a substantial likelihood of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would harm others; and (4) whether the public interest is served by granting injunctive relief. *Hamilton's Bogarts, Inc. v.*

*Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (citation omitted); *see also Ne. Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted).

**B.**

The Railway, however, contends that the traditional factors governing imposition of a temporary restraining order have been superseded here. Federal courts have consistently held that when federal statutes "expressly authorize[] the issuance of an injunction, the traditional requirements for equitable relief need not be satisfied." *United States v. ITS Fin., LLC*, 592 F. App'x 387, 400 (6th Cir. 2014) (explaining that the traditional requirements did not apply to motions for injunctive relief related to violation of 26 U.S.C. § 7402, a portion of the Internal Revenue Code). Here, the Railway is suing under the Railroad Revitalization and Regulatory Reform Act (the "4-R Act"), 49 U.S.C. § 11501(b) and (c), which specifies that "a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section." § 11501(c). Section 11501(c) expressly provides that it applies "notwithstanding section 1341 of title 28." 28 U.S.C. § 1341 provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." In context, then, § 11501(c) clearly authorizes district courts to enjoin the collection of state taxes assessed against rail transportation property, if the tax constitutes "a violation of subsection (b) of" § 11501. § 11501(c).

In fact, Courts have concluded that, where discrimination exists, an injunction against the tax assessment and collection is required. *See Atchison, T. & S. F. Ry. Co. v. Lennen*, 640 F.2d 255, 260 (10th Cir. 1981) (holding that the district court abused its discretion in not imposing a preliminary injunction because the district court found that the plaintiffs would likely prevail on its argument that the taxes assessed violated the 4-R Act). *See also Trailer Train Co. v. State Bd. Of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983) (explaining that "subsection (c)" of an earlier but substantially identical version of the act "specifically authorizes a district court to grant injunctive relief to prevent a violation of the statute." *Trailer Train Co. v. State Bd. Of Equalization*, 697 F.2d 860, 869 & n.16 (9th Cir. 1983).

Because § 11501 clearly authorizes (and even requires) injunctive relief, "the standard requirements for equitable relief need not be satisfied when an injunction is sought" based on that section. *Id. See also Atchison*, 640 F.2d at 259 ("When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown."); *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 479 (2d Cir. 1995) (same) (citing *CSX Transp. V. Tennessee Bd. Of Equalization*, 964 F.2d 548, 551 (6th Cir. 1992)). Rather, "[i]n order to issue a preliminary injunction under [§ 11501(c)] a court must determine only whether there is 'reasonable cause' to believe that a violation of [§11501(b)] has occurred or is about to occur." *CSX Transport*, 964 F.2d at 551 (6th Cir. 1992).

### III.

### A.

Accordingly, a temporary restraining order must be imposed if there is reasonable cause to believe that the Railway has or is about to suffer discrimination under the 4-R Act. The

Railway is suing under § 11501(b), which prohibits a "State, subdivision of a State, or authority acting for a State or subdivision of a State" from engaging in certain acts that "unreasonably burden and discriminate against interstate commerce." Those proscribed acts are identified as follows:

> (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
>
> (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
>
> (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
>
> (4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

*Id.*

Courts have interpreted § 11501(b)(4) as containing "a congressional desire that courts . . . forbid states to single out railroads for taxation." *Burlington N. R. Co. v. City of Superior, Wis.*, 932 F.2d 1185, 1188 (7th Cir. 1991). *See also Atchison, Topeka & Santa Fe Ry. Co. v. State of Ariz.*, 78 F.3d 438, 441 (9th Cir. 1996) (explaining that the 4-R Act was intended "encompass all discriminatory state taxes, not just discriminatory property taxes or in lieu taxes" and collecting cases).

"The key question thus becomes whether a tax might be said to "discriminate" against a railroad under subsection (b)(4)." *CSX Transp., Inc. v. Alabama Dep't of Revenue*, 562 U.S. 277, 286 (2011). According to the Supreme Court, "discrimination" in the context of § 11501(b)(4) is "'the failure to treat all person equally when no reasonable distinction can be found between

those favored and those not favored.'" *Id.* (quoting Black's Law Dictionary 534 (9th ed. 2009)). The Supreme Court further provided examples of discrimination in taxation: "To charge one group of taxpayers a 2% rate and another group a 4% rate, if the groups are the same in all relevant respects, is to discriminate against the latter. That discrimination continues (indeed, it increases) if the State takes the favored group's rate down to 0%." *Id.*

The reasoning in *CSX Transportation* makes clear that discrimination under § 11501(b)(4) can be "shown even if there is no direct evidence of targeting." *Kansas City S. Ry. Co. v. Koeller*, 653 F.3d 496, 510 (7th Cir. 2011). Rather, disparate tax treatment of a railroad must be based on "reasonable distinctions" between the "favored and disfavored." *Id.* In *Koeller*, the "commissioners may have started off with a 'reasonable distinction' in mind: improved land derives a greater benefit from flood prevention than unimproved land and, we will assume, may legitimately be taxed at a rate that reflects this benefit." *Id.* at 510–511. But the commissioners "quickly went astray" because they "did not tax all industrial and commercial property equally." *Id.* at 511. The *Koeller* Court identified several errors by the commissioners: "Rather than assess the actual value of agricultural property," they made "sweeping estimates." *Id.* The commissioners made assumptions regarding "the benefit conferred by the levy," which were "sorely lacking in a solid empirical base" and were "discriminatory in practice." *Id.* And the commissioners used inconsistent and unsupported assumptions regarding the Railroad's maintenance costs versus the maintenance costs of other commercial and industrial properties. *Id.* at 511–512.

**B.**

Given the current posture, the Defendants have not been afforded an opportunity to justify their apportionment of taxes or advance a "reasonable distinction" upon which it relied in

allocating a greater proportion of taxes to the Railway. However, the "Drain Code," Mich. Comp. L. 280, which empowered the Defendants to apportion taxes, provides codified guidelines regarding the "apportionment of benefits." Mich. Comp. L. 280.152. Specifically, "[a]ll apportionments of benefits under the provisions of this act shall be upon the principle of benefits derived." *Id.* The Railway contends that, at least as regards the Railway's apportionment of taxes, "the Commissioner equated 'benefit' with the degree to which it presumed [the Railway] would tend to contribute to stormwater runoff within the districts." That assertion, while speculative, is consistent with the alleged facts regarding the tax liability calculation.

The Complaint alleges that the Commissioner and District calculated the Railway's contribution to stormwater runoff by reliance on "runoff coefficients," which were originally promulgated to determine the stormwater runoff contributions of specific highway land uses. Compl. at 4. If true, then the stormwater runoff calculation for the Railway's property was based entirely on the runoff characteristics of potentially dissimilar property. While the Railway's gravel covered rail bed likely bears significant similarities to a gravel road, Defendants' assumption that both generate runoff in similar capacities is speculative and empirically unsupported (at least based on the facts currently known). More troubling is the allegation that the Commissioner "presumed an average runoff coefficient of 0.2" for "all other private land uses in the district. *Id.* That runoff coefficient is applicable to grassy areas under state highway rules. *Id.* Given the fact that numerous businesses operate in the Districts, the assumption that the remainder of the districts (other than the Railway's property) is undeveloped grassland is untenable. Defendants' apparent assumption that the Railway's property generates stormwater runoff at a rate significantly higher than other developed land is suspect.

Importantly, the state highway runoff coefficients, if used consistently, might constitute a "reasonable distinction" whereby the Railway might be apportioned more tax liability than other private businesses. While a tailored analysis that investigated the specific characteristics of the taxed property would be most accurate, such an approach would likely tax Defendants' resources and is not necessarily required to comply with § 11501(b). The fundamental problem here, like in *Koeller*, is that Defendants apparently used inconsistent and unsupported assumptions regarding the Railway's runoff coefficients versus other private land owners. When he used the gravel road runoff coefficient for part of the Railway's apportionment, but presumed that the remainder of the district (which includes significant residential, commercial, and industrial development)[1] generated runoff at the same rate as grassland, the Commissioner did not rely on a "reasonable distinction."

Thus, assuming the Railway's alleged facts to be true, there is reasonable cause to believe that the current tax apportionment was calculated in a discriminatory way. As such, the Railway has satisfied the requirements for imposition of a temporary restraining order. And, for several additional reasons, a temporary restraining order is necessary. To begin with, at least one court has concluded that the 4-R Act does not empower district courts to order refunds of past tax payments. *See Burlington N. R. Co. v. Bair*, 584 F. Supp. 1229, 1232 (S.D. Iowa 1984) (explaining that the plain language of the Act "does not provide for tax payment refunds" and that the Eleventh Amendment would bar retrospective monetary relief). And the Railway represents that the tax liability became due and payable yesterday. Thus, if the Railway pays the tax and then prevails in this action, it may be unable to recover any overpayment. Meanwhile, if the Railway refuses to pay the tax apportionment during the pendency of this action, it may subject itself to lien enforcement proceedings by the Commissioner. While, as explained above,

---

[1] *See* Map of Drainage District, ECF No. 1, Ex. D.

the Railway need not show it will suffer irreparable harm to justify a temporary restraining order, its current situation warrants temporary relief.

**C.**

The remaining issue is the scope of the temporary restraining order. Although a restraining order is necessary, "principles of comity require the federal court to act with restraint." *Koeller*, 653 F.3d at 512. Accordingly, the temporary restraining order should be constructed "to eliminate only [the] discriminatory effects rather than enjoining the entire rate or assessment scheme." *Kansas City S. Ry. Co. v. McNamara*, 817 F.2d 368, 378 (5th Cir. 1987). However, given the outstanding uncertainties regarding how and why the Railway's tax liability was calculated as it was, there is currently insufficient information to determine what the Railway's proper tax assessment would have been. Until the Defendants are provided an opportunity to respond and clarify the assessment and apportionment process, that will not change. As such, a narrowly tailored restraining order that eliminates only the (allegedly) discriminatory effects of Defendants' actions is currently impossible. Accordingly, Defendants will be restrained from taking any further action to collect or levy the tax liability assessments, as currently calculated, for the Freeland and Ostrander Drain Districts. If a more nuanced analysis is possible after the preliminary injunction hearing, this issue will be revisited.

**IV.**

In accordance with the procedures outlined by Federal Rule of Civil Procedure 65, certain procedural steps must be followed to ensure due process to all parties. First, notice must be served upon Defendants. The Railway will be directed to serve its complaint, its motion for injunctive relief, and this Order on Defendants. Second, a hearing will be scheduled on the Railway's request for a preliminary injunction. The hearing will be scheduled before the

expiration of this order, which is 14 days from the hour it is issued. Defendants will have an opportunity to respond to the Railway's motion but must do so prior to the motion hearing.

**V.**

Accordingly, it is **ORDERED** that Plaintiff Lake State Railway Company's motion for a temporary restraining order, ECF No. 4, is **GRANTED.**

It is further **ORDERED** that Defendants Freeland Tile Drain Drainage District, Ostrander Drain Drainage District, and Brian Wendling, are **TEMPORARILY RESTRAINED AND ENJOINED** from taking any further action to collect or levy the tax liability assessments, as currently calculated, identified in Plaintiff Lake State Railway Company's complaint.

It is further **ORDERED** that Plaintiff Lake State Railway Company is **DIRECTED** to serve the complaint, ECF No. 1, its motion for a temporary restraining order, ECF No. 4, and a copy of this Order on Defendants **on or before August 3, 2017.**

It is further **ORDERED** that a hearing on Plaintiff Lake State Railway Company's motion for a preliminary injunction, ECF No. 4, is **SCHEDULED** for **August 30, 2017 at 3:00 p.m.**

It is further **ORDERED** that the parties are **DIRECTED** to appear for the motion hearing.

It is further **ORDERED** that Defendants are **DIRECTED** to file any response to Plaintiff's motion for a preliminary injunction that they wish to be considered **on or before August 25, 2017.**

Dated: August 1, 2017            s/Thomas L. Ludington
                                                                                       THOMAS L. LUDINGTON
                                                                                       United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 1, 2017.

                                          s/Kelly Winslow
                                          KELLY WINSLOW, Case Manager